# In the United States Court of Federal Claims

No. 20-456C
(Filed: July 25, 2025)

* * * * * * * * * * * * * * * * * * * * * * * *

PLATINUM SERVICES, INC.,

                        *Plaintiff*,

v.

THE UNITED STATES,

                        *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * *

*Anthony J. Marchese*, Washington, D.C., for plaintiff. *Carol L. O'Riordan*, of counsel.

*Stephanie A. Fleming*, Trial Attorney, United States Department of Justice, Commercial Litigation Branch, for defendant, with whom were *Sheryl L. Floyd*, Trial Attorney, *Daniel D. Falknor*, Trial Attorney, *Michael D. Snyder*, Trial Attorney, *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Martin F. Hockey, Jr.*, Deputy Director. *Todd P. Federici*, of counsel.

## OPINION

BRUGGINK, *Senior Judge*.

This is an action for breach of contract brought against the United States, acting through the Department of Defense ("DoD"). Plaintiff, Platinum Services, Inc. ("Platinum"), alleges it contracted with the government to transport 45 shipments of household goods for military servicemembers during the summer months of 2016, 2017, and 2018. Plaintiff claims the services contracted for included line-haul freight (i.e., long-distance transportation) as well as accessorial services (i.e., additional moving services beyond standard long-distance transportation). According to plaintiff, the parties agreed to plaintiff's rates listed on its freight tenders,

justifying $17,651,695 in total charges. Plaintiff asserts it performed those transportation services yet has not been paid and is thus entitled to the full contract amount in damages. In response, the government agrees that it asked for line-haul shipping, but argues that it never requested that plaintiff perform any accessorial services and, in any event, never agreed to the rates reflected on plaintiff's freight tenders. As a result, the government claims plaintiff is only entitled to, at most, $400,612 in quantum meruit damages for the value of the shipping. Trial was held November 12–15, 2024. Following post-trial briefing and closing arguments, we conclude that plaintiff has established its breach of contract claim only with respect to its line-haul freight services. Plaintiff has not established its breach of contract claim for its accessorial services but is entitled on a quantum meruit basis to recover for those services actually performed. We conclude that plaintiff is owed $801,424.90 in total damages, as explained below.

## BACKGROUND

When military personnel are deployed or relocated, the United States Transportation Command ("USTRANSCOM"), a command under the DoD, is responsible for managing the transportation of servicemembers' household goods. The command operates through regional shipping offices scattered around the country. The offices contract out to private shippers the actual work of packing, loading, storing, shipping, and unloading. It became apparent during trial that there are multiple contractual vehicles available to the local offices in obtaining these services, and that the contracts can engage private companies to do some or all of the steps in moving servicemembers' goods. If this case is an accurate depiction of how military members' goods are shipped, one cannot help but observe that a new method could usefully be devised.

Some of the contract vehicles available are subject to procedures unique to the military—the Military Freight Traffic Unified Rules ("MFTURP-1"). Others are subject to the Federal Acquisition Regulations ("FAR"). A single move may involve both FAR-based and MFTURP-1-based contracts.[1]

---

[1] FAR-based contracts are not, by default, subject to the MFTURP-1, as the scope of the MFTURP-1 "does not include the transportation of . . . Federal Acquisition Regulation (FAR) contracts . . . unless the [MFTURP-1] is specifically incorporated into the contract or agreement." MFTURP-1

This case involves 45 shipments of military servicemembers' household goods undertaken by Platinum, a transportation and storage company, on behalf of a single, local government shipping office, the Joint Personal Property Shipping Office ("JPPSO") for the Mid-Atlantic ("JPPSO-MA"), which operates out of Fort Belvoir in the Washington, D.C. area. Platinum has long performed shipping services for the military and was well known to JPPSO-MA.

Transportation of household goods is frequently undertaken through what is known as the Direct Procurement Method ("DPM"). MFTURP-1 App. D, § J at 264; JX 63 at App. 265; *see also* Trial Tr. vol. 2, 402–03, 408 (all subsequent trial transcript references are to "Tr."). For the shipments in question, however, Platinum's performance did not follow the DPM method, but instead followed a modified, impromptu method devised by JPPSO-MA for use during busy seasons. The parties refer to this as the "hybrid method," although it has no explicit regulatory provenance. Before describing how the parties tried to use that hybrid method for the disputed shipments, it is necessary to lay out the components of the more typical DPM, because the hybrid method was cobbled together from parts of the DPM.

I.  A Standard Move under the Direct Procurement Method

Under the DPM, transportation is divided into three phases, potentially involving multiple contractual arrangements. Tr. at 402–03, 611. During the first DPM phase, under a FAR-based contract with USTRANSCOM, an Origin DPM Contractor picks up the servicemember's goods from their residence and transports the goods to its warehouse, where the goods are then packed and crated. [2] *Id.* at 402–03, 550.

During the second DPM phase, a Transportation Service Provider ("TSP") picks up the goods from the Origin DPM Contractor's loading dock and performs line-haul freight services, transporting the goods over long

_____

§ A.I.D.1.c; Joint Ex. ("JX") 63 at App. 7–8. Thus, multiple contractual vehicles exclusively subject to either set of regulations may be involved in a single move.

[2] The FAR is a set of regulations governing the federal government's procurement of goods and services. 48 C.F.R. § 1.101. These regulations outline processes by which the government should solicit competition and administer contracts. *See generally* 48 C.F.R. § 1.102.

distances, to the receiving dock of a Destination DPM Contractor. *Id.* at 371, 611. Plaintiff is one such TSP. *Id.* at 71, 95–96, 105.

Line-haul freight services provided by TSPs are not provided pursuant to FAR-based contracts.[3] Instead, an entity becomes a TSP by first submitting a Tender of Freight Services ("tender") to the Global Freight Management ("GFM") system, a creature of MFTURP regulations. *Id.* at 74–75; MFTURP-1 §§ A.II.B.3, A.IV.A.2. The GFM system is managed by the Surface Deployment and Distribution Command ("SDDC"), a sub-command of the USTRANSCOM, and operates as a digital repository of tenders. Tr. at 84, 786, 828–29. A tender operates as a TSP's offer to perform certain transportation services for the DoD and includes the TSP's rates for those services, chief among which is the TSP's offer to perform line-haul freight services. Pl.'s Ex. ("PX") 46 at 3; PX 50 at 3; PX 55 at 3.

A TSP's tender may also include rates for performing additional moving services beyond line-haul freight, known as "accessorial" services, which are not normally performed by TSPs in a DPM movement. Tr. at 95–97, 416, 765. These accessorial services include, but are not limited to, expedited delivery, loading and unloading of goods, and handling freight not adjacent to the vehicle. PX 46 at 4; PX 50 at 4; PX 55 at 4.

The MFTURP allows a TSP to charge for expedited service only when "the requested [d]elivery [d]ate" for a particular shipment "is less than the standard transit time." MFTURP-1, Item 35; Joint Ex. ("JX") 63 at App. 96. The MFTURP calculates the standard transit time for a shipment based on the number of drivers assigned to that shipment, as well as the distance to the destination. MFTURP-1, Item 5; JX 63 at App. 84. If a TSP is requested to deliver a shipment before the calculated standard transit time for that shipment, the TSP may charge for expedited service. MFTURP-1, Item 35; JX 63 at App. 96.

The MFTURP also allows a TSP to charge for loading and/or unloading services if the TSP performs loading and/or unloading services for a particular shipment "unassisted by shipper or consignee." MFTURP-1, Item 51; JX 63 at App. 101. Additionally, a TSP may charge for handling

---

[3] FAR Part 47, governing the federal government's acquisition of transportation-related services, exempts freight transportation acquired through bills of lading from the FAR. 48 C.F.R. § 47.200(b)(2). Bills of lading are discussed later in this opinion.

freight at positions not adjacent to the vehicle if the TSP moves freight shipments "from or to a position that is not immediately adjacent to the vehicle." MFTURP-1, Item 49; JX 63 at App. 100. If the vehicle is merely separated by an intervening sidewalk or walkway from the loading or unloading position, the TSP cannot charge for this service. MFTURP-1, Item 49; JX 63 at App. 100.

Under phase two of the DPM, the SDDC operates through regional JPPSOs which contract directly with TSPs to perform line-haul freight services. Tr. at 377–81. In contracting for line-haul freight services, JPPSOs first manually enter each TSP's tender information into the electronic Transportation Operation Personal Property Standard System ("eTOPS"). *See generally* Defense Transportation Regulation ("DTR")[4] Part IV, Ch. 406; *see also* Tr. at 419–20, 758–59. That tender information includes the TSP's name, address, and line-haul freight rates. *Id.* at 505. JPPSOs then use eTOPS to review and compare prices between TSPs and select a particular TSP for a shipment. *Id.* at 769–70, 791–93. Tender information in the GFM system is not automatically populated into eTOPS, as the two systems are not integrated, and thus, cannot communicate with one another. *Id.* at 791–92. As a result, tender information must be manually entered into eTOPS. *Id.* at 504–05, 791. Unlike the GFM system, eTOPS does not include information pertaining to accessorial services, and thus, does not include rates for those services. *Id.* at 505, 547, 769.

When selecting a TSP for line-haul freight services, a JPPSO Transportation Officer ("TO"), or a Transportation Agent ("TA") designated by a TO,[5] creates and issues a Government Bill of Lading ("GBL") to that

---

[4] The DTR applies to all modes of transportation for the DoD generally, while the MFTURP applies to TSPs specifically. *See generally* DTR Parts I–VII; MFTURP-1 § A.1.A. Since Platinum is a TSP, this opinion will primarily focus on the MFTURP's application with some references to DTR Part IV (relating to "Personal Property").

[5] Under the MFTURP, a TO is a "[p]erson designated by the commander of a military activity to perform traffic management functions," including managing personal property shipments and storage. MFTURP-1, App. E, § J at 277; JX 63 at App. 277; PX 49. A TA can be designated or appointed by the TO to perform traffic management functions, including signing off on the expenditure of government funds for the execution of personal property shipments and storage. MFTURP-1, App. E, § J at 277; JX 63 at App. 277; PX 49.

TSP through eTOPS. Tr. at 442, 545, 792. The GBL contains information such as the TSP's name and tender number, the delivery address, and the required delivery date. *E.g.*, JX 1 at 11. That GBL then operates as an acceptance of certain transportation services offered on the TSP's tender. Tr. at 385–86.  If there are any errors in the GBL, a TA can issue a Standard Form 1200 Government Bill of Lading Correction Notice ("1200 Correction Notice") to manually correct those errors. MFTURP-1, Item 419; JX 63 at App. 233; Tr. at 120–21, 442; *see also, e.g.*, JX 1 at 13–14.

The shipping office involved in this case, JPPSO-MA, was reliant on TSPs sending their tenders directly to the office, in which a JPPSO-MA clerk would then manually enter the tender information into eTOPS. Tr. at 416–20, 750, 758–59; PX 46 at 1; PX 55 at 1. Although JPPSOs have access to the GFM system, Tr. at 787, 819, there is no evidence JPPSO-MA relied on the GFM system to access tenders. Additionally, once JPPSO-MA issued a GBL and/or 1200 Correction Notice to a TSP for a particular shipment, if for any reason that TSP needed to charge for additional accessorial services beyond typical line-haul freight, JPPSO-MA had an internal procedure where it required the TSP to prepare and submit in advance an accessorial request form for approval. Tr. at 416, 537–45. When completing an accessorial request form, TSPs were required to indicate which additional accessorial services it would perform, as well as furnish an estimated cost for those services. *Id.* at 542.

Under a normal DPM movement, phase two concludes with the TSP delivering the goods to the receiving dock of a Destination DPM Contractor. *Id.* at 611.  Phase three involves a Destination DPM Contractor operating under a FAR-based contract with USTRANSCOM. The Destination DPM Contractor unloads and unpacks the crated shipments and delivers them directly to the servicemember's new residence. *Id.* at 611–13.

II.    Non-Temporary Storage

In addition to the DPM, another tool the DoD may use when in the process of transporting servicemembers' goods is Non-Temporary Storage ("NTS").  *Id.* at 152; DTR Part IV, Attach. V.J.1. NTS is ordinarily used to place servicemembers' goods in long-term storage when they do not currently have a long-term residential address in the United States, such as when the servicemember is stationed overseas for an extended period and will not require their household goods. *Id.* at 152, 403. The goods placed in NTS remain in storage until the servicemember returns from overseas deployment and obtains a new residence in the United States. *Id.* at 403. At

that point, the last two phases of the DPM commence, starting with the TSP picking up the goods from the NTS provider. Tr. at 549–50. Like line-haul freight services, NTS services do not involve FAR-based contracts; instead, NTS providers offer these services under NTS tenders of service, which JPPSOs can accept. *Id.* at 149–50; *see generally* JX 55–58.  In addition to being a TSP, Platinum is also an NTS provider. JX 55–58.

Yet another contractual mechanism for arranging the movement of servicemembers' household goods came up at trial, the 400 NG Tariff Program, which is discussed in more detail later in this background section.

III.     Peak Season, Short-Term Storage, and the "Hybrid" Method

In the household goods transportation industry, demand peaks during May, June, July, and August. Tr. at 513–14. Due to the high concentration of movements during this period, JPPSOs regularly experience a shortage of available TSPs and DPM providers. *Id.* at 469–71. As a result, the NTS option was often used by JPPSO-MA to store household goods temporarily until transportation to the servicemember's new residence could be arranged. *Id.* at 406.

As a further response to pressure during these peak seasons, JPPSO-MA developed an alternative to the standard DPM move, which the TO at JPPSO-MA, Frank Thomas, characterized as the "hybrid" shipping method. *Id.* at 429–30, 613. Instead of using an Origin DPM Contractor, a TSP, and a Destination DPM Contractor to deliver a servicemember's household goods, the hybrid method eschewed the use of DPM contractors. Mr. Thomas and his office instead required TSPs to pick up the goods from NTS service providers at the origin and to then perform both line-haul shipping and destination delivery to each servicemember. *Id.* at 548–49. Under the hybrid method, the servicemember's goods would be picked up by the NTS contractor and placed at its warehouse for indefinite storage. Tr. at 490, 492–93. When the time came for delivery, a TSP (1) picked up the goods from the NTS dock, packed, and loaded the goods onto its own truck for line-haul transportation; (2) performed line-haul transportation; and (3) instead of handing the goods off to a Destination DPM Contractor, unloaded and itself delivered the household goods to the servicemember's new residence. *Id.* at 408–09, 495–97, 503–04, 548–49.

The hybrid shipping method was a more streamlined method of delivering servicemembers' household goods than the DPM during peak seasons when DPM contractors were in short supply. This is because,

7

notwithstanding the pricing problems discussed below, the hybrid shipping method allowed a TSP already holding goods in its NTS facility to perform the latter two phases of the DPM without JPPSO-MA having to go through multiple other contractors. Tr. at 429–32, 469–70.

IV.    JPPSO-MA's Requests to Platinum

The case at hand involves 45 household moves performed by Platinum for JPPSO-MA during the peak summer months of 2016, 2017, and 2018—all of which were performed under this hybrid method. The parties' dispute involves contract formation and, in some instances, performance, of certain accessorial services. We lay out the pertinent facts below.

A.    2016 Shipments

During the 2016 peak season, JPPSO-MA was experiencing such a high volume of movements that there were not enough TSPs or DPM contractors available to transport servicemembers' goods. *Id.* at 102, 404; JX 27 at 899. As a result, on July 13, 2016, Mr. Thomas contacted Mario Smoot, CEO of Platinum, to help facilitate movements. Tr. at 414–15, 660–61. Mr. Smoot had known Mr. Thomas for almost two decades, and Platinum had been involved in numerous moves for JPPSO-MA as a TSP and as a NTS provider. *Id.* at 414–15, 609–10, 622. Platinum, however, was not an Origin or Destination DPM Contractor, nor had it previously performed moving services under the hybrid method. *Id.* at 611–15, 618, 681.

Mr. Smoot first became aware of the hybrid method during that July 13 phone call with Mr. Thomas, in which Mr. Thomas informed him that various shipments needed to be moved, and that Platinum could, under the accessorial services listed on its freight tender, transport household goods already placed in its NTS warehouse directly to the servicemembers' addresses. *Id.* at 428–29, 621–22, 660–61. Below is Mr. Thomas' recollection of that discussion:

> Q. . . . in your discussion with Mr. Smoot, did you talk about how accessorial services may be used to facilitate the hybrid method?
>
> A. What we discussed is that as part of the service, it might be needed depending on the member's situation or need, yes, sir.

8

> Q. And for [the shipments], were you reaching out to Platinum and asking them if they had some availability to work with you to assist using the hybrid method?
>
> A. Correct.

*Id.* at 428.

Comporting with Mr. Thomas's testimony, below is Mr. Smoot's recounting of that conversation:

> THE WITNESS: I talked to Frank. He said, "You can move these shipments." I said, "How?" He said, "You can move them under your freight tender." I said, "How in the hell can I get paid for loading and unloading and do what I got to do?" He says, "You have it underneath your tender. Send me your tender."

*Id.* at 621.

Following that discussion, at 9:04 AM that same morning, Ms. Carie Lewis, Platinum's Office Manager, emailed Platinum's GFM-registered 2016 tender, number 114191, at the direction of Mr. Smoot, to Mr. Thomas. PX 46; PX 55; Tr. at 88–89. Mr. Smoot did not review Platinum's tender before sending it to Mr. Thomas—nor did Mr. Thomas review Platinum's tender once it was received. Tr. at 416–17, 622. Although a JPPSO-MA clerk was responsible for manually entering Platinum's tender information into the eTOPS system, including Platinum's name and line-haul freight rate, Platinum's tender information was never entered into eTOPS. *See id.* at 419, 504–05; *see also, e.g.*, JX 1 at 11, 13–14. Platinum's tender included its rate for line-haul freight services as well as its rates for additional accessorial services, including "EXP" (expedited service), "URC" (loading and unloading), and "HHB" (handling freight not adjacent to the vehicle). JX 46.

In addition to Platinum's line-haul rate per mileage and weight,[6] Platinum's rates for its accessorial services at that time were $400 per mile

---

[6] The MFTURP allows a TSP to charge a percentage of baseline freight rates set by the SDDC. MFTURP-1 § A, Tbl. D; JX 63 at App. 44. The SDDC's baseline rates, which are periodically published, are calculated based on mileage and weight. SDDC Class Rate Publication No. 100A; MFTURP-1, App. G, ¶ 84; JX 63 at App. 287. A TSP may list a percentage on its tender,

per vehicle for expedited service; $400 per hundredweight for loading and unloading services, subject to a minimum charge of $1,000; and $500 per hundred pounds, subject to a minimum charge of $500 per shipment, for handling freight not adjacent to the vehicle, with a maximum charge of $900 per shipment. *Id.* at 4. Platinum's accessorial prices were dramatically higher than those of other GFM-registered providers. *See generally* Def.'s Ex. ("DX") 245 at 2, Attach. 7. For example, the next highest rate for expedited service in 2016 was only $8 per mile per vehicle. *Id.* at Attach. 7-c. Therein lies this lawsuit.

Almost immediately thereafter, at 11:46 AM, Mr. Thomas sent Mr. Smoot an email asking whether Platinum could perform transportation services under the hybrid method for five servicemembers: Arthur Graham, Paul Darling, Jeffery Buck, John Harrison, and Jonathan Ortiz. JX 1 at 29–30. Approximately two hours later, Mr. Smoot replied that Platinum could service four of the five shipments—Graham, Darling, Buck, and Harrison—but added that the "GBL's will need to authorize . . . HHB (loading and unloading not adjacent to vehicle) EXP (expedited service) and URC 1 (for both loading and offloading by the TSP)." *Id.* at 29. Mr. Smoot requested that Mr. Thomas "[p]lease respond ASAP so that we can coordinate with the customers." *Id.* There was no response to that email by Mr. Thomas.

Nonetheless, on July 18, 2016, Mr. Melvin Stalls, an employee of JPPSO-MA, copied Mr. Thomas on an email to Mr. Smoot, stating: "Mario, here is the paper work for the shipments that you and Mr. Thomas discussed . . . . This will be a two-part email since I will not be able to send all the attachments." JX 3 at 137. Attached to those emails were, among other things, GBLs and 1200 Correction Notices for five shipments: Graham, Darling, Harrison, Scott Liftman, and Nathan Mitchell. JX 86; JX 1 at 31, 36; JX 2 at 82–85; JX 3 at 138–40; JX 4 at 166–67, 172, 201; JX 5 at 13, 16,

─────────────────

indicating a rate above, below, or equal to the SDDC's baseline freight rates (e.g., 100% would be equal). MFTURP-1 § A, Tbl. D; JX 63 at App. 44. In 2016, Platinum had listed minimum freight charges of 999% of the SDDC's baseline rates. JX 46 at 3. The MFTURP alternatively allows a TSP to charge freight per hundredweight, MFTURP-1 § A, Tbl. D; JX 63 at App. 43–44, which Platinum did in 2017 and 2018, JX 47 at 3; JX 48 at 3. In 2017, Platinum listed a freight rate at $58 per hundredweight, subject to a minimum weight of 1,000 pounds, and in 2018, listed its freight rate at $80 per hundredweight, once again subject to a minimum weight of 1,000 pounds. JX 47 at 3; JX 48 at 3.

39. Correction notices were issued because the original GBLs listed the incorrect tender number and/or vendor, listed a Destination DPM Contractor's address instead of the servicemember's residential address as the delivery point, and failed to include any accessorial services. *E.g.*, JX 1 at 11 (indicating errors). These mistakes or omissions occurred because Platinum's tender information was never inputted by a JPPSO-MA clerk into JPPSO-MA's eTOPS system, and because the eTOPS system does not contain input fields for accessorial services. Tr. at 440–41, 448–52. As a result, JPPSO-MA issued correction notices to correct the omissions, reflecting Platinum as the TSP, the servicemember's new residential address as the destination delivery address, and authorized accessorial services, including loading and unloading and expedited service.[7] *E.g.*, JX 1 at 13 (indicating corrections). The 1200 Correction Notices, however, did not amend the GBLs to include Platinum's correct tender number, nor did they include handling freight not adjacent to the vehicle as an authorized accessorial service. *E.g.*, *compare* JX 1 at 11, *with* JX 1 at 13.

As an illustrative example, the original GBL for the Graham shipment listed "Continental Transportation" as the "Transportation Company" with a 0002891 tender number. JX 1 at 11 (blocks 1 and 31). It also listed "American Safety Movers, Inc" at "5250 Old Louisville Road" in Pooler, Georgia as the "destination delivery address." *Id.* (block 18). The 1200 Correction Notice for the Graham shipment amended the GBL to include "Platinum Services" as the "Transportation Company" and Graham's new residential address, "8 White Ibis Lane" in Savannah, Georgia, as the "destination delivery address." *Id.* at 13 (amending blocks 1 and 18). It also included the following language with respect to accessorial services: "Loading and Unloading Authorized . . . Expedited Service Authorized." *Id.*

Following those five shipments, through a series of phone calls and emails, Platinum and JPPSO-MA agreed to 12 additional shipments in 2016—all involving GBLs and 1200 Correction Notices issued by JPPSO-MA, which corrected the same omissions and authorized the same accessorial services. Tr. at 412–13; JX 6 at 93–96; JX 7 at 169–72; JX 8 at 230–38; JX 9 at 31–35; JX 10 at 83–94; JX 11 at 115–22, 167–68; JX 12 at 177–82, 200–01; JX 13 at 258–61; JX 14 at 29–30, 35; JX 15 at 59–64, 81–85; JX 16 at 133–39, 168; JX 17 at 215–19, 243–48; JX 86. Many of the

---

[7] The GBLs also authorized packing and unpacking and exclusive use services, which are not pertinent to this dispute. Exclusive use services are briefly discussed later in the background section.

1200 Correction Notices administered in 2016 were issued by JPPSO-MA at the request of Platinum. JX 1 at 37–50; JX 86. At no point with respect to any of these shipments, however, did the 1200 Correction Notices amend the GBLs to include Platinum's correct tender number, Tr. at 108–09, 111, 193, 466–67, or to include handling freight not adjacent to the vehicle as an authorized accessorial service, *e.g.*, JX 1 at 36 (showing absence). In addition, although accessorial services, including expedited service and loading and unloading, were requested on the 1200 Correction Notices, at no point did either the GBLs or 1200 Correction Notices include Platinum's rates for any of its accessorial services. *E.g.*, JX 1 at 11, 13 (showing absence of rates). Furthermore, the GBLs and 1200 Correction Notices for four out of the 17 shipments were issued after Platinum had already begun performance. JX 86.

B. 2017 Shipments

JPPSO-MA had difficulty meeting its shipping needs the following year as well. On June 12, 2017, Dennis Beougher, Chief of JPPSO-MA's Personal Property Management Division, forwarded an email to Mr. Smoot, stating that "all TSP['s] are blacked out," and that Mr. Beougher would like to "give tried and true TSP[s] the opportunity to identify any shipments they can handle." JX 18 at 328–29. Attached to that email was a spreadsheet containing a list of available shipments, including servicemembers' names, origin and destination locations, and other shipping details. *Id.* at 330–69. Later that same day, at Mr. Smoot's direction, Ms. Lewis responded to Mr. Beougher, informing him that "[w]e have highlighted all the shipments that we have availability for," and attached a spreadsheet highlighting the shipments Platinum could move. *Id.* at 370–407.

On June 20, 2017, Ms. Lewis sent a follow up email to Mr. Thomas, notifying him that "I've attached a list of the GBLs we will need—some sooner than others," and that the GBLs would need to include authorization for, among other things, loading and unloading and expedited service. *Id.* at 408. On June 30, 2017, Mr. Thomas sent an email to Ms. Lewis and Mr. Smoot, stating that he would get the paperwork to Ms. Lewis by that following Monday. JX 42 at 58. According to Platinum's GFM-registered 2017 tender, Platinum's rates for its accessorial services were $1,000 per mile per vehicle for expedited service; $400 per hundredweight, subject to a minimum charge of $2,400, for loading and unloading services; and $400 per hundred pounds, subject to a minimum charge of $400 per shipment and no maximum charge for handling freight non-adjacent to the vehicle. JX 47 at

4. In the aggregate, Platinum's 2017 accessorial rates were even higher than its 2016 accessorial rates. *Compare* JX 46 at 4, *with* JX 47 at 4.

It was not until July 13, 2017 that Mr. Darren Addison, a Transportation Assistant at JPPSO-MA, sent Ms. Lewis an email containing the GBLs and 1200 Correction Notices for five shipments Platinum had indicated it could move—Matthew Dehl, Thomas Mackey, Jonathan Mozingo, Tabitha Perez, and Michael Ringer. JX 18 at 418. Between July 26 and December 28, JPPSO-MA sent Platinum GBLs and 1200 Correction Notices for 21 additional shipments. JX 86. Like the 2016 shipments, the GBLs for the 2017 shipments were corrected by 1200 Correction Notices to include servicemembers' residential addresses as the delivery point, as well as authorization for loading and unloading and expedited service. Tr. at 448–52, 466; *e.g.*, JX 42 at 98 (showing correction notice for accurate delivery address and inclusion of accessorial services). Unlike the 2016 GBLs, the 2017 GBLs included Platinum's name and GFM-registered 2017 tender, number 114451, because a JPPSO-MA clerk had manually entered Platinum's 2017 tender into eTOPS. JX 21 at 263 (showing Platinum's correct tender number in GBL block 31). Neither the GBLs nor 1200 Correction Notices, however, included handling non-adjacent freight as an authorized accessorial service or Platinum's rates for any of its accessorial services. *E.g.*, JX 23 at 449, 451 (showing absences). The GBLs and 1200 Correction Notices for 25 out of the 26 shipments performed by Platinum in 2017 were issued after Platinum had already begun performance. JX 86.

C. 2018 Shipments

During the following peak season, on June 14, 2018, JPPSO-MA reached out to Platinum to inquire whether it could provide moving services for two shipments: Patrice Johnson and Justin Silverman. JX 44 at 221; JX 45 at 346. Unlike the 2016 and 2017 shipments, however, Platinum was asked to deliver these two shipments from its NTS warehouse to a Destination DPM Contractor—not to the servicemembers' addresses. JX 44 at 290, 298; JX 45 at 361; JX 87; JX 88 at 23, 38. JPPSO-MA sent Platinum the GBL and 1200 Correction Notice for the Johnson shipment on July 11, 2018, and the GBL and 1200 Correction Notice for the Silverman shipment on July 13, 2018. JX 86. Because the GBLs contained incorrect pickup addresses (citing a different vendor's warehouse altogether) and did not include expedited or loading services,[8] those issues were corrected in the

---

[8] Because Platinum was delivering the 2018 shipments to a Destination DPM Contractor's warehouse rather than the servicemembers' residential

13

1200 Correction Notices. JX 44 at 256; JX 45 at 360. Additionally, because a JPPSO-MA clerk had not entered Platinum's information from its GFM-registered 2018 tender, number 114472, in the eTOPS system, the GBLs included Platinum's inactive 2017 tender—an error which was not subsequently corrected in the 1200 Correction Notices for either shipment. JX 44 at 255–56; JX 45 at 360–61. Like the 2016 and 2017 shipments, although the 1200 Correction Notices issued by JPPSO-MA included authorization for Platinum to perform expedited and loading services, neither of the GBLs nor the 1200 Correction Notices contained Platinum's rates for those services. *E.g.*, JX 44 at 297–98 (showing absence of rates). The GBLs and 1200 Correction Notices for both shipments were executed after Platinum had already begun performance. JX 86.

Notably, at no point between 2016 and 2018 did JPPSO-MA receive or approve an accessorial request form—which would have included Platinum's rates for its accessorial services—for Platinum to perform and charge for any other services than line-haul freight. Tr. at 327. Instead, plaintiff relies on the fact that its 2016, 2017, and 2018 tenders, which contained Platinum's pricing for its accessorial services, were registered in the GFM system during the relevant times, and that the 1200 Correction Notices issued by JPPSO-MA for all 45 shipments authorized Platinum to perform accessorial services.

V.    Platinum's Performance

All 45 shipments between 2016 and 2018 originated in Platinum's NTS warehouse under NTS contracts between Platinum and JPPSO-MA before Platinum began performing moving services under the hybrid method. JX 86 (showing that standard form 1164s were completed for handling out shipments from NTS); JX 13 at 223, 227 (showing that the pickup location was corrected to reflect Platinum's NTS); JX 14 at 10, 12–13; JX 39 at 376, 378, 380; JX 43 at 110, 112, 114. Platinum's NTS tender included a price for "handling out" services, which included removing the goods from storage and placing the goods onto the warehouse platform. JX 56 at 14548–57; JX 57 at 14560–70; JX 58 at 14573–84. Correspondingly, the "removal actions" section of each NTS service order directed Platinum to release the goods "to

_____

addresses, Platinum is not claiming unloading services or handling freight not adjacent to the vehicle for either shipment. We thus only address expedited and loading services for the 2018 shipments. Additional details are discussed later in this background section.

14

dock." JX 60 at 219–61. Platinum's performance under the NTS contracts for these origin point storage services has been paid for and is not in dispute. Tr. at 145–46.

Once the goods were released to the NTS warehouse platform, Platinum shipped the goods in one of two ways: (1) using its own trucks and drivers; or (2) contracting with third-party freight haulers and destination agents. JX 86; Tr. at 351–53. When Platinum used its own trucks and drivers, the servicemembers' goods were packed—but not crated—and loaded from the NTS loading dock into one of Platinum's trucks or trailers. Tr. at 352–53. Those goods were then directly transported to each servicemember's address. *Id.* at 353; JX 86; JX 88. When Platinum used third-party freight haulers and destination agents, Platinum would pack, crate, and load the goods into the trucks or trailers of third-party freight haulers. Tr. at 670–71. Once the goods were loaded, the third-party freight haulers would transport the goods to the warehouses of third-party destination agents, or, for the two 2018 shipments, to the warehouse of a Destination DPM Contractor.[9] *Id.* at 668–69; JX 88 at 23, 38. For the 2016 and 2017 shipments, the third-party destination agents would then transport the goods to each servicemember's address. *Id.* at 669.

For the 2016 and 2017 shipments, once the goods reached the servicemembers' addresses, either Platinum or a third-party destination agent would park the moving truck on a street, parking lot, or driveway, unload the goods, and carry the goods into the servicemembers' homes (which Platinum later characterizes as handling freight not adjacent to the vehicle). *Id.* at 633–34. Out of the 45 shipments, 18 shipments were delivered by Platinum before the standard delivery date. JX 86 (comparing stipulated delivery dates with standard delivery dates). Overall, 14 shipments were performed directly by Platinum, while 31 were performed by contracted third parties. JX 86. Platinum paid for all services performed by its third-party contractors. Tr. at 720–22.

---

[9] To be clear, for these 2016 and 2017 shipments, the destination agents were not DPM government-contracted providers. They were agents of Platinum, and thus, Platinum charged the government for their services.

VI.    Platinum's Billing

It was not until September 22, 2017, that Platinum submitted its invoices for the 17 2016 shipments to the Defense Finance and Accounting Service ("DFAS"). JX 87; Tr. at 650. Subsequently, on December 15, 2017, Platinum submitted its invoices for 24 of the 26 2017 shipments. JX 87. In December 2018, as Platinum's invoices were being reviewed, DFAS reached out to Mr. Thomas to inquire whether Platinum's charges were valid for a particular shipment, that of Andrew Chubb. Tr. at 559–60. Although Mr. Chubb's shipment had a required delivery date of August 3, 2017, it did not reach the servicemember's home until December 19, 2017. *Id.* at 560–63; JX 86. At that point, for the first time, Mr. Thomas was made aware of Platinum's extremely high charges for its accessorial services. Tr. at 474–75. On January 10, 2020, Platinum submitted its invoices for the two 2018 shipments, and on February 25, 2020, submitted its invoices for the two remaining 2017 shipments. JX 87.

For all 45 shipments, in addition to the $317,627.90 charged for line-haul freight services, Platinum charged JPPSO-MA $34,082,000 for expedited service, $2,305,240 for origin loading, $2,132,560 for destination unloading, and $1,312,268 for handling freight not adjacent to the vehicle. *Id.* This is an average of nearly $900,000 per servicemember.[10] DFAS denied payment of Platinum's invoices for all 45 shipments. JX 1–45 at Tab A. For each shipment, DFAS prepared and issued a Statement of Difference ("SOD"), a prepayment audit informing Platinum "of an apparent error, defect or impropriety in an invoice received by the Government." *Id.* Each SOD also contained the following language:

> Invoice is being rejected for the following reasons . . . No supporting documentation was provided with the invoice showing that the services billed were performed. Request is being made to [Platinum] to provide a corrected invoice for a Direct Pick UP and Delivery (not a DPM) shipment with all

---

[10] Plaintiff's complaint supplements this amount with charges for two other accessorial services, exclusive use and holiday and/or Sunday delivery, which we discuss in the next sub-section, ballooning the average to nearly $1.7 million per servicemember, although some of those charges are no longer at issue.

16

supporting documentation including authority for billed charges to the U.S. Government.

*Id.*

VII.    Procedural History

On April 17, 2020, Platinum filed its complaint, seeking $76,176,619.54 for breach of contract. In addition to line haul, expedited service, loading and unloading, and handling freight non-adjacent to the vehicle, this amount included charges for two other accessorial services: $44,603,000 for exclusive use for all 45 shipments (in which a TSP dedicates an entire vehicle to transporting a single shipment); and $6,000 for one holiday and/or Sunday delivery surcharge.

On July 10, 2020, we granted the government's motion to remand the case to the General Services Administration ("GSA") to consider Platinum's claims. On November 29, 2021, the government filed GSA's final remand decision, which made the following findings: (1) Platinum's delivery services were more in line with the 400 NG Tariff program[11] than the freight program and should thus be billed under the 400 NG rates; (2) Platinum applied "'hidden' costs that were exorbitant and unnecessary, notwithstanding with industry practices, and not proven to be provided as billed"; and (3) as a result, Platinum was only entitled to receive $673,326.87 for all 45 shipments. DX 195 at App. 1175–78. GSA arrived at this amount by applying the average rates from other transportation providers offering similar services in the 400 NG program, including packing and unpacking and other destination service charges (i.e., "elevator service, stair and excess

---

[11] The 400 NG Tariff program is a separate method used by USTRANSCOM for transporting military household goods. DX 195 at App. 1143; Tr. at 241, 402, 880. Under that program, instead of having three separate contractors perform moving services as required by the DPM, a single contractor would pick up the goods from the servicemember's old residence and deliver those goods directly to the servicemember's new residence. DX 195 at App. 1143–44; Tr. at 241, 610–11. Providers under the 400 NG Tariff program are tasked with origin packing, destination unpacking, special handling of goods, and arranging third-party services. DX 195 at App. 1143. Platinum was not a participant in the 400 NG Tariff program at the time. Tr. at 611, 682, 740–41, 886, 911.

distance carriers and additional transportation charges"), to the shipments at issue. *Id.* at App. 1151.

Thereafter, the parties filed cross-motions for summary judgment. Plaintiff argued that its services were contracted for under the hybrid method, and that the accessorial services provided were billed in accordance with the MFTURP. In response, the government argued that no contracts were formed, that GSA's decision should be given deference, that the JPPSO-MA TO, Mr. Thomas, did not have authority to enter contracts for hybrid services with Platinum, that the GBLs and 1200 Correction Notices at issue were defective, and that Platinum's billings were not in fact in accordance with the MFTURP. In our August 10, 2023 summary judgment order, we denied those motions in part, determining that there were unresolved factual issues regarding contract formation and performance. We determined, however, that Mr. Thomas could obligate the government to the type of services performed by Platinum, that the GBLs issued were not defective merely because they required Platinum to deliver the goods directly to the servicemembers' home addresses, and that Platinum's charges for exclusive use, amounting to $44,603,000, were not compliant with the MFTURP, and thus, not recoverable. *Platinum v. United States*, No. 20-456 (Fed. Cl. Aug. 10, 2023), ECF No. 63.

At trial, we took testimony from Platinum employees Mr. Smoot and Ms. Lewis, as well as from government employees Mr. Thomas, Mark Rice, Thomas's successor as JPPSO-MA's TO, David Walker, the Freight Management Branch Chief within the SDDC, David Jones, the Senior Traffic Management Specialist within the USTRANSCOM, Linda Hum, a Traffic Management Specialist within the USTRANSCOM, Terry Fisher, a Transportation Systems Analyst within the SDDC, and Yvonne Robertson, the Chief of the Disputes Resolution Branch within GSA. Testimony was also heard from Mark Gmyr, the government's expert witness on damages. Plaintiff filed a motion in limine seeking to exclude the testimony of Messrs. Gmyr, Walker, Jones, and Fisher, which we address later in this opinion.

In its post-trial brief, plaintiff withdrew its claim for the $6,000 charge for one holiday and/or Sunday delivery, as well as its claim for expedited service charges for 27 of the 45 shipments, amounting to $22,498,000. As a

result, plaintiff now seeks $17,651,695.90 in total damages,[12] consisting of $317,627.90 for line-haul freight, $11,584,000 for expedited service for 18 shipments, $2,305,240 for origin loading for all 45 shipments, $2,132,560 for destination unloading for 43 shipments, and $1,312,268 for handling freight not adjacent to the vehicle for 43 shipments. For the government's part, it claims in its post-trial brief that Platinum is only entitled to quantum meruit damages of $400,612, or alternatively, $673,326.87—the amount GSA calculated for all 45 shipments—because no express contracts were formed.

## DISCUSSION

The Tucker Act grants this court jurisdiction over certain claims for money damages against the United States founded upon the United States Constitution, federal statutes, executive regulations, or contracts. 28 U.S.C. § 1491(a)(1); *United States v. Mitchell*, 463 U.S. 206, 215–18 (1983). Specifically, in a contract case, "the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 444 (2019) (internal citations omitted). Even when a plaintiff provides goods or services to the government pursuant to an invalid or unenforceable express contract, this court may still "utilize[] quantum meruit as a basis for awarding the plaintiff the fair market value of what it supplied to the government." *Perri v. United States*, 340 F.3d 1337, 1344 (Fed. Cir. 2003).

At the outset, we recognize that Platinum is entitled to contract damages for its line-haul freight services. The government concedes that valid contracts were formed between Platinum and JPPSO-MA for Platinum to perform line-haul freight services for all 45 shipments per defendant's closing argument on Friday, March 7, 2025:

> The Court: [A]re you saying there was no agreement [and] that the government didn't ask for any kind of shipment?

---

[12] Although plaintiff's post-trial brief claims $17,645,695.90 in total damages, according to the parties' stipulation on Platinum's billing (JX 87), Platinum's total claim is actually $17,651,695.90 ($6,000 more) for the services at issue.

19

> Defendant's Counsel: I'm saying there is no evidence we mutually agreed on which accessorial services would be offered and what the government would pay for those.
>
> The Court: So, what that tells me is that there was [an] agreement for line-haul shipping as to 45 shipments?
>
> Defendant's Counsel: Yes, your honor.
>
> The Court: Okay
>
> Defendant's Counsel: We agree on that.

Closing Arg. at 9:53–10:19, *Platinum v. United States*, No. 20-456 (Fed. Cl. March 7, 2025). The government also does not dispute that Platinum indeed performed these line-haul services at the request of JPPSO-MA. Def.'s Post-Trial Br. at 2 ("Platinum indisputably performed line-haul or shipping services for 45 household goods shipments moving as freight between 2016 through 2018, and they performed these shipments at the request of [JPPSO-MA]."). Since Platinum has not been compensated for any line-haul freight it performed under valid contracts for those services, it is entitled to contract damages for line-haul freight, amounting to $317,627.90. This is the amount the parties have jointly stipulated Platinum has billed according to its freight tenders. JX 87. The rest of our discussion thus focuses on Platinum's contract breach claim for the remaining $17,334,068, encompassing Platinum's accessorial services.

Here, the parties' arguments are directed at three issues: (1) whether valid contracts were formed between Platinum and JPPSO-MA for Platinum to perform and charge for accessorial services under its freight tenders; (2) whether Platinum in fact performed those services; and (3) whether, and to what extent, Platinum is entitled to payment for its services—either under the prices listed on its freight tenders or under a quantum meruit calculation. We address each issue in turn.

I.    Contract Formation

Plaintiff primarily argues that, after the initial conversation between Mr. Thomas and Mr. Smoot on July 13, 2016, in which Mr. Thomas inquired whether Platinum could perform movements under the hybrid method by effectuating the accessorial services on its freight tender, valid express,

written contracts for all 45 shipments—via the GBLs and 1200 Correction Notices—were formed between Platinum and JPPSO-MA for Platinum to perform accessorial services. According to plaintiff, the 1200 Correction Notices, which were issued by JPPSO-MA, clearly indicate that JPPSO-MA authorized expedited service, loading and unloading, and handling freight not adjacent to the vehicle for the 2016 and 2017 shipments, and that the 1200 Correction Notices for the two 2018 shipments include JPPSO-MA's authorizations for expedited and loading services. Plaintiff points out that, for the 2016 and 2017 shipments, the 1200 Correction Notices include the annotations "EXP" for expedited service and "URC" for loading and/or unloading. The 2018 shipments also include the annotations "URC" for loading services and "EXP" for expedited service. Moreover, because the 1200 Correction Notices for the 2016 and 2017 shipments correct the destination delivery address to each servicemember's residential address, Platinum claims that it was expected to deliver each servicemember's household goods into their residences, thus authorizing handling freight not adjacent to the vehicle.

Plaintiff further claims that JPPSO-MA and Platinum agreed on Platinum's rates for its accessorial services. Plaintiff highlights the fact that Platinum's rates for its accessorial services are explicitly listed on its 2016, 2017, and 2018 freight tenders. For the 2016 shipments, at the request of Mr. Thomas, Platinum sent its 2016 tender directly to Mr. Thomas before JPPSO-MA issued the GBLs and 1200 Correction Notices. Although the 2016 and 2018 GBLs and correction notices do not reference Platinum's correct tender number for those years (some referencing another TSP's tender or an expired and/or cancelled Platinum tender), Platinum's active tenders were at all relevant times present in the GFM system, which JPPSO-MA has access to. Thus, Platinum argues that the incorrect tender numbers listed on the GBLs and correction notices for the 2016 and 2018 shipments were merely clerical errors. According to Platinum, both parties intended to contract pursuant to Platinum's active tenders. Furthermore, Platinum's correct tender number in 2017 was listed on the GBLs and 1200 Correction Notices for the 2017 shipments. As a result, Platinum asserts its rates for its accessorial services were made plain to JPPSO-MA when the GBLs and correction notices were issued, and that any clerical errors should be corrected by the court through equitable reformation.

21

In response, the government argues there is no evidence Platinum was requested by JPPSO-MA to perform these shipments under the so called "hybrid" method, and that, even if Platinum was asked to perform these shipments under this method, there was no meeting of the minds regarding which accessorial services the hybrid method would entail. The government claims that Platinum cannot rely on the GBLs and 1200 Correction Notices to support its contract formation claim because those documents are defective. First, the defendant highlights the fact that neither the GBLs nor correction notices for the 19 shipments that took place in 2016 and 2018 referenced an active Platinum tender number—instead, they referenced either an expired and/or withdrawn Platinum tender number or a tender number from a different vendor altogether. Thus, those GBLs and 1200 Correction Notices do not reflect JPPSO-MA's intent to contract for Platinum's accessorial services. Second, the government draws attention to the fact that, for 30 of the 45 shipments, including 25 of the 26 2017 shipments, the GBLs and 1200 Correction Notices were issued after Platinum had already begun performance, which is contrary to the procedures set out in the U.S. Government Freight Transportation Handbook, which prohibit issuance of GBLs after performance. DX 20 at 6.

Alternatively, defendant argues that, even if the parties intended for Platinum to perform these hybrid movements using Platinum's accessorial services, there was no meeting of the minds between the parties on price for any of those services. The government relies on the testimony of Mr. Thomas and Mr. Smoot, which we address below, to show that neither man was aware of Platinum's accessorial rates when Mr. Smoot agreed to perform these shipments. The government further points out that eTOPS—the system used by JPPSO-MA to compare freight rates, select a transportation provider, and generate GBLs and 1200 Correction Notices—does not contain any information on accessorial services, including the TSP's prices for those services. Therefore, according to the government, there could not have been a meeting of the minds regarding how much Platinum could charge for accessorial services. Thus, no valid contracts formed for the accessorial services at issue: expedited service, loading and unloading, and handling freight not adjacent to the vehicle, per defendant.

A.  Price is an Essential Term

It is well established that "[t]he requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997). Since we have already determined that Mr. Thomas, as JPPSO-MA's TO, had authority to bind the government in contract, *Platinum Services, Inc. v. United States*, 20-456 (Fed. Cl. Aug. 10, 2023), ECF No. 63 (order granting in part and denying in part summary judgment), we focus on whether there was mutual intent to contract between the parties.

Mutual intent—otherwise known as "meeting of the minds"—must involve "an unambiguous offer to contract upon specific terms, an unambiguous acceptance of that offer, and an intent to contract." *LaMirage, Inc. v. United States*, 44 Fed. Cl. 192, 197 (1999), *aff'd*, 232 F.3d 912 (Fed. Cir. 2000). In determining whether parties have formed a contract through a meeting of the minds, we look at the "totality of the factual circumstances." *Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990), *opinion modified on reh'g* (Mar. 19, 1991). This is an objective determination—not one in which the "prospective contracting parties are . . . expected to engage in telepathy." *Firth Const. Co. v. United States*, 36 Fed. Cl. 268, 276 (1996).

A meeting of the minds requires an offer and acceptance to *specific* terms. *LaMirage*, 44 Fed. Cl. at 197. While this "does not mean than an offer must have certainty as to all terms, it does require a 'meeting of the minds on [all] essential terms,' which typically includes price." *STG Int'l, Inc. v. United States*, 165 Fed. Cl. 577, 583 (2023) (quoting *Keehn v. United States*, 110 Fed. Cl. 306, 327 (2013)). Indeed, in a related case also involving Platinum, we found price to be an essential term when contracting for Platinum's transportation services under its freight tender. *Platinum Servs., Inc. v. United States*, 168 Fed. Cl. 130, 137 (2023) (Case No. 19-1714). Where Platinum and the government "were in effect relying on different systems of tender management," leading to different assumptions concerning price, we found no meeting of the minds with regards to price, and thus, no valid contracts. *Id.* As a result, we defaulted to quantum meruit to find the reasonable value of the services received. *Id.*

As we explain below, we find that, although the parties intended to enter into agreements for Platinum to perform these 45 shipments under JPPSO-MA's "hybrid" method, there was no meeting of the minds on Platinum's prices for its accessorial services. Thus, we find no contracts were formed for accessorial services for all 45 shipments.

B.  There was no Meeting of the Minds on Price

First, it is clear from the record that JPPSO-MA intended for Platinum to perform these 45 shipments under the "hybrid" method, including accessorial services. Mr. Thomas testified that JPPSO-MA had been using the hybrid method during peak seasons since at least 2008, involving delivery from an NTS warehouse to the servicemembers' residential addresses. Tr. at 408–10. He also testified that for a TSP to actually delivery goods under the hybrid method, it was necessary to procure accessorial services, although he did not specify which ones. *Id.* at 428. Both Mr. Thomas and Mr. Smoot testified that they had a conversation regarding whether Platinum could perform moving services under the hybrid method, and Mr. Smoot stated that, upon learning about the hybrid method from Mr. Thomas, he was told he could effectuate the hybrid method through the accessorial services listed on Platinum's GFM-registered tender.

Platinum's offers for its line-haul freight and accessorial services, which were both necessary to effectuate hybrid movements, were listed on its freight tenders between 2016 and 2018 and were registered in the GFM system during the relevant periods. JX 46; JX 47; JX 48. JPPSO-MA attempted to accept Platinum's offers on its freight tenders when it issued the GBLs and 1200 Correction Notices for each shipment. All the 1200 Correction Notices issued by JPPSO-MA for the 2016 and 2017 shipments revised the delivery destination on the original GBLs from a DPM contractor's storage facility to the servicemembers' residential addresses,[13]

---

[13] JX 1 at 29–31, 36; JX 2 at 82, 85; JX 3 at 137, 140; JX 4 at 201, 204; JX 5 at 15, 39; JX 6 at 69, 93; JX 7 at 169–71; JX 8 at 230–31; JX 9 at 31–32, 35; JX 10 at 61, 83–84; JX 11 at 122; JX 12 at 181, 200; JX 13 at 228, 258; JX 14 at 15–16, 29; JX 15 at 62, 81–85; JX 16 at 186, 206; JX 17 at 244, 285; JX 18 at 328–69, 411, 422; JX 19 at 678, 680; JX 20 at 119, 129; JX 21 at 264–68; JX 22 at 419–23; JX 23 at 447, 449; JX 24 at 590, 595; JX 25 at 728, 733; JX 26 at 851, 855; JX 27 at 984, 987; JX 28 at 1110, 1115; JX 29 at 154, 159; JX 30 at 288, 292; JX 31 at 421; JX 32 at 488, 494; JX 33 at 622, 628; JX 34 at 741, 745; JX 35 at 56–59, 63; JX 36 at 118–21, 125; JX

which is consistent with the hybrid method. Additionally, the 1200 Correction Notices for all 45 shipments revised the original GBLs to include expedited service and loading and unloading,[14] which reflect some of the additional services Platinum claims it performed to effectuate the hybrid method.[15]

Although the government points out that the 2016 and 2018 GBLs and 1200 Correction Notices do not reference Platinum's active tender numbers, this does not change the fact that JPPSO-MA intended to contract with Platinum for its accessorial services. All the 1200 Correction Notices in 2016 and the GBLs in 2018 reference Platinum as the TSP selected to perform these shipments.[16] Moreover, even when the GBLs and 1200 Correction Notices referenced another TSP's tender number altogether, according to Mr. Thomas's testimony, JPPSO-MA nevertheless intended to contract with Platinum for the shipments at issue:

Q. Do you know why—do you know why the original GBL was issued to a company called Continental?

---

37 at 275; JX 38 at 298, 355; JX 39 at 499–502, 509; JX 40 at 631–33, 636; JX 41 at 782, 786; JX 42 at 58, 94, 98; JX 43 at 185.

[14] JX 1 at 36; JX 2 at 85; JX 3 at 140; JX 4 at 204; JX 5 at 15; JX 6 at 69; JX 7 at 171; JX 8 at 231; JX 9 at 35; JX 10 at 61; JX 11 at 117–18; JX 12 at 181; JX 13 at 228; JX 14 at 13; JX 15 at 60–61; JX 16 at 189; JX 17 at 285; JX 18 at 422; JX 19 at 680; JX 20 at 129; JX 21 at 268; JX 22 at 423; JX 23 at 449; JX 24 at 595; JX 25 at 733; JX 26 at 855; JX 27 at 987; JX 28 at 1115; JX 29 at 159; JX 30 at 292; JX 31 at 417, 421; JX 32 at 494; JX 33 at 628; JX 34 at 745; JX 35 at 63; JX 36 at 125; JX 37 at 275; JX 38 at 298; JX 39 at 509; JX 40 at 636; JX 41 at 786; JX 42 at 98; JX 43 at 185.

[15] The accessorial service, handling freight not adjacent to the vehicle, is discussed further in the "Performance" section of our discussion. Additionally, as discussed in that section, although expedited service is annotated on all 45 correction notices, JPPSO-MA included a required delivery date necessitating expedited service in only three shipments.

[16] JX 1 at 36; JX 2 at 85; JX 3 at 140; JX 4 at 204; JX 5 at 41; JX 6 at 96; JX 7 at 171; JX 8 at 231; JX 9 at 39; JX 10 at 92; JX 11 at 117–18; JX 12 at 181–82; JX 13 at 228–31; JX 14 at 679–80; JX 15 at 62; JX 16 at 137–38; JX 17 at 218–19; JX 44 at 192; JX 45 at 321.

A. When I started seeing this later on, I went back to the branch and division chief and say, "Well, why are we having to do a correction notice to change the GBL?" And from what was explained to me, they [were] having some issues and were trying to get these out, so to get them out, they went ahead on and generated the one showing whoever was on the GBL and did a correction notice to change it to who should be directly on the GBL.

Q. Thank you. So what did this do with respect to—

A. So what [the Transportation Agent] did here, he . . . generated this—it might have been Mr. Stalls—it came out under Continental, but he knew it [was] going to be going to Platinum to do the service for the Government. So he did the correction to read Platinum Services . . . .

. . . .

Q. And in Block 31, do you know whose tender number that is?

. . . .

A. Ah, the—for Block 31 showing that Platinum—what Platinum tender number should have been. Based on the original GBL, they had Continental.

. . . .

Q. And would that be a mistake that needs to be corrected?

A. Yes, uh-huh.

Tr. at 448–50, 452. We thus do not find that incorrect tender numbers on the 2016 and 2018 GBLs and 1200 Correction Notices vitiates JPPSO-MA's intent to contract for Platinum's accessorial services.

While we find the parties clearly intended to contract for Platinum to perform accessorial services pursuant to the hybrid method, we do not find, however, a meeting of the minds regarding Platinum's pricing for those services. While the 1200 Correction Notices were issued by JPPSO-MA, containing JPPSO-MA's authorization for expedited service, loading and

unloading, and, arguably, handling non-adjacent freight (which we address later in this discussion), this is only evidence that JPPSO-MA requested these services, not that it was aware of Platinum's pricing. Mr. Thomas testified that he never reviewed Platinum's tenders, which contained Platinum's pricing for its accessorial services, but instead forwarded all tender-related emails to his staff. *Id.* at 416–17. Although Platinum's tenders were present in the GFM system, and although JPPSO-MA had access to that system, JPPSO-MA's TAs relied on eTOPS—not the GFM system—to compare rates between TSPs and issue GBLs. *Id.* at 420, 434, 769–70, 791–92. The record shows that eTOPS does not contain any information regarding accessorial services—including rates—since eTOPS is intended to house information pertaining to line-haul freight only. *Id.* at 505, 547, 769. Nor were there any accessorial request forms submitted by Platinum for any of these 45 shipments that would have contained Platinum's accessorial rates. *Id.* at 327.

Critically, Mr. Smoot himself was not aware of Platinum's accessorial charges. When asked about Platinum's high accessorial charges, Mr. Smoot responded: "[a]t that point in time, when I was asked to do these shipments, I didn't look at what was in my tender. I didn't even know I could do it. I sent it to [Mr. Thomas], and he said I could do it." *Id.* at 622. Later, when asked whether Mr. Smoot and Mr. Thomas, during their conversations, knew what Platinum was charging for its accessorial services, Mr. Smoot responded: "Quite honestly, no." Tr. at 645–46. After performing all 45 shipments, and before sending his bills to DFAS, Mr. Smoot testified he compiled his billing and sent it to a third-party individual to "review my billing to make sure it was accurate according to the documentation." *Id.* at 652. When asked whether Mr. Smoot had gone through a third-party audit of his billing before, Mr. Smoot responded "no," and when asked whether it was done because the high charges caught him by surprise, Mr. Smoot responded: "[w]ell, quite honestly, they're pretty steep, yeah." *Id.* at 653.

Most telling, Mr. Smoot testified that, if he had known what Platinum's accessorial prices were at the time, he would not have used them:

THE COURT: What do you think you likely would have proposed if the parties—if you and Mr. Thomas had spotted this problem back then?

27

THE WITNESS: I can say this, it would have been much more reasonable. I would like to—since you—I mean, I don't know—if I could have done it for the members and for Frank at a better price, if I would have realized what the full price was at the time, all I did was bill according to my tender.

. . . .

THE COURT: Well, assuming you had the freedom to kind of name your price—

THE WITNESS: Well, yeah, if I had freedom to name my price, I would have based it on a—to be honest, I would have probably been around . . . 200 percent of the tariff, the 400 NG, not a discounted tariff, at 200 percent, because I have done that before.

THE COURT: All right. That's for the hauling.

THE WITNESS: That's for the hauling, the packing, the loading, that's for everything, whatever the—well, that's for the—the carrier rate— . . . .

*Id.* at 741–42.

It was not until December 2018, well after the shipments had been performed, that Mr. Thomas became aware of Platinum's accessorial charges, which he determined were "extremely high" and "night and day" from typical charges. *Id.* at 474–76. It is thus clear from the record that neither JPPSO-MA nor Mr. Smoot knew what Platinum was charging for accessorial services when they attempted to contract for these 45 shipments. It is also clear that Mr. Smoot would not have charged, and JPPSO-MA would not have agreed to, Platinum's listed accessorial prices if those prices had been known beforehand. As a result, we find there was no meeting of the minds between Mr. Smoot and JPPSO-MA regarding pricing for accessorial services.

Price being an essential term for contract formation, we conclude that no valid contracts were formed for Platinum's accessorial services.[17] Because no valid contracts were formed regarding Platinum's accessorial services, it is unnecessary to address defendant's formation argument regarding the timely issuance of GBLs and 1200 Correction Notices for these shipments. For the same reason we find it unnecessary to address plaintiff's equitable reformation argument, as we cannot reform contracts that were never formed.[18]

## II.    Performance

Although there was no meeting of the minds between the parties on pricing for Platinum's accessorial services, the government must pay plaintiff for whatever accessorial services Platinum actually performed. Platinum has not been compensated by the government for any services other than those paid under its NTS contracts. *See generally* JX 1–45 at Tab A.

Platinum alleges that it performed expedited service for 18 shipments, performed origin loading for 45 shipments, performed destination unloading for 43 shipments, and handled freight not adjacent to the vehicle for 43 shipments. To the extent that accessorial services were performed and accepted, we rely on quantum meruit to calculate the fair market value of those services. We begin by determining which services were performed by Platinum in accordance with the MFTURP, as the parties agree that

---

[17] We recognize a seeming tension between finding fully formed contracts for line-haul services but not for accessorial services, as both were offered and performed by Platinum concurrently. This seeming tension is immaterial, however, as the parties have agreed that valid contracts were formed with respect to line-haul services, despite the dispute over accessorial services. In effect, the parties have agreed to treat the two types of services differently for purposes of resolving this dispute.

[18] We need not address Platinum's alternative attempt to cobble together oral contracts through phone conversations or informal written contracts through email communications between JPPSO-MA and Platinum. Because there was no meeting of the minds on Platinum's rates for its accessorial services, no valid contracts were formed for accessorial services regardless of the alleged mode of contract. For the same reason we find it unnecessary to address plaintiff's argument that the GBLs and 1200 Correction Notices ratified these alleged prior agreements.

Platinum's performance is subject to those regulations. Pl.'s Post-Trial Br. at 2, 28–32; Def.'s Post-Trial Br. at 22, 24–25, 29, 33–34*; see also United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986) ("[A] contractor may recover at least on a . . . *quantum meruit* basis for the value of the *conforming* goods or services received by the government . . . .") (emphasis added).

A. Expedited Service

According to the MFTURP, expedited service is an "accessorial service [where] shippers can request a TSP to guarantee delivery before the required Standard Transit Time." MFTURP-1, Item 35; JX 63, App. 96. The MFTURP calculates the Standard Transit Time for each shipment based on the number of miles to the destination, as well as the number of drivers assigned to each shipment. MFTURP-1, Item 5; JX 63, Apps. 83–85. Expedited service charges can only apply where "the requested [d]elivery [d]ate is less than [the] standard transit time," and where "EXP" is annotated on the GBL. MFTURP-1, Item 35; JX 63, App. 96. Here, the parties have stipulated to the required delivery date, the standard transit time, and the actual delivery date for each shipment. JX 86. Additionally, the 1200 Correction Notices, which operate to amend the GBLs for the 18 shipments at issue, all include the expedited service annotation. JX 3 at 140; JX 4 at 204; JX 8 at 231; JX 10 at 61; JX 15 at 60–61; JX 17 at 285; JX 18 at 422; JX 21 at 268; JX 22 at 423; JX 23 at 449; JX 30 at 292; JX 33 at 628; JX 34 at 745; JX 37 at 275; JX 38 at 298; JX 40 at 636; JX 41 at 786; JX 45 at 360.

Platinum argues that it should be compensated for performing expedited service on 18 shipments, because it delivered those shipments before the standard transit time calculated for each shipment. In response, the government avers that, because JPPSO-MA never requested that Platinum deliver before the standard transit time for 15 of the 18 shipments, expedited service for those shipments were not actually performed, and Platinum is not entitled to compensation. We agree with the government.

The MFTURP clearly requires that expedited service be "requested" for it to be charged. MFTURP-1, Item 35; JX 63 at App. 96. Correspondingly, JPPSO-MA included a "required" delivery date on each GBL. JX 86; *see also, e.g.*, JX 1 at 32 (indicating required delivery date in block eight of GBL). According to the parties' stipulations, for all but three

shipments, the required delivery date designated for each shipment was either on or after the standard delivery date calculated for each shipment—not before. JX 86. For example, although the actual delivery date for the Darling shipment was July 21, 2016, five days earlier than the standard delivery date of July 26, 2016, JPPSO-MA only requested that Platinum deliver the shipment by July 28, 2016, which was two days *after* the standard delivery date. *Id.*; *see also* JX 3 at 117–32, 138. As a result, we exclude expedited service for 15 of these 18 shipments, as it was not actually performed. In effect, where the government did not request expedited service, plaintiff was a volunteer. Platinum is thus only entitled to compensation for expedited service for three shipments: Adrian Silvera, Jeffrey Buck, and Tedd Wilkerson. Those are the only shipments for which JPPSO-MA requested a delivery date before the standard delivery date, and in which Platinum in fact delivered before that standard date. JX 86; *see also* JX 15 at 68–78, 104–05; JX 17 at 221–40, 283, 285; JX 40 at 527–40, 636–37.

## B. Origin Loading and Destination Unloading Services

Under the MFTURP, a TSP is permitted to charge for loading and/or unloading services if those services are performed "unassisted by shipper or consignee." MFTURP-1, Item 51; JX 63, App. 101. Platinum argues it indeed performed "unassisted" loading with respect to all 45 shipments and unloading for 43 shipments, because the hybrid method involves neither an Origin DPM Contractor to perform loading services nor a Destination DPM Contractor to perform unloading services. Platinum therefore asserts that it is entitled to compensation for the loading and unloading services it properly performed.

The government, on the other hand, claims that NTS services already include loading services, and, because Platinum has been compensated for its NTS services for these 45 shipments, requiring the government to pay for separate loading charges would compensate Platinum twice for the same work. The government alternatively argues that because loading and/or unloading only appears once as "URC 1"—and not twice—on each of the 1200 Correction Notices for each shipment, loading and/or unloading services were intended to be priced together as a single charge. As a result, according to the government, Platinum is double charging by billing for loading and unloading accessorial services separately. We disagree.

31

By requiring Platinum to deliver these 45 shipments directly from its NTS warehouse to the servicemembers' residential addresses, JPPSO-MA was necessarily requesting that Platinum perform both loading and unloading services—loading from the NTS warehouse dock to the freight truck and unloading from the freight truck to the destination location. Since the hybrid method did not call for Origin DPM Contractors to perform loading services or Destination DPM Contractors to perform unloading services, Platinum has shown that it performed these services "unassisted."

Additionally, Platinum's loading services were not already included in its NTS services as the government contends. According to Mr. Thomas' testimony, NTS services do not include loading onto a freight truck:

> THE COURT: The NTS contractor puts it in the warehouse and leaves it there right?
>
> THE WITNESS: Um-hum.
>
> THE COURT: Is that the end of the NTS process?
>
> THE WITNESS: Yes, sir, until we ask for it to be released out.
>
> THE COURT: And is that part of—has the Government already paid for that?
>
> THE WITNESS: We pay for everything going in, and then the only thing we pay the NTS contractor is to handle out to the dock to be picked up by the next TS[P]—

Tr. at 550–51. Mr. Thomas's testimony makes it clear that JPPSO-MA's payments under NTS contracts cover all storage services up to the point at which goods are "handl[ed] out to the dock"—which, by definition, does not include loading onto a freight truck. *Id.* at 551. Indeed, Mr. Thomas's testimony comports with the documentary evidence. As plaintiff points out, the line item, "Handling Out," on its NTS tender is defined as "[h]andling out, labor and equipment required to remove from storage and *place onto warehouse platform*." JX 56 at 14548–57; JX 57 at 14560–70; JX 58 at 14573–84 (emphasis added). "Handling Out" services under Platinum's NTS tender does not include loading onto a freight truck. As a result, the NTS payment did not include the loading accessorial services performed by Platinum.

32

We also find that the annotation, "URC1," does not pertain to the number of times loading and/or unloading can be charged, nor does it imply that loading and unloading services are charged together. It simply references the rate at which those services are charged. As plaintiff notes, the MFTURP states that "[l]oading and/or unloading service[s] will be subject to a charge of: URC(1) $_____ per hunderedweight, subject to a minimum charge of URC(2) $_____." MFTURP-1, Item 51; JX 63, App. 101. The inclusion of "URC1" on the 1200 Correction Notices merely means that, whenever loading and/or unloading services are performed, JPPSO-MA would be charged a certain rate per hundredweight. Thus, entering "URC1" twice would be superfluous, as it would be tantamount to listing the same price twice. Moreover, the inclusion of "and/or" between "loading" and "unloading" indicates that loading and unloading services may be charged either separately or together. Therefore, loading and unloading services were not meant to be priced as a single charge merely because "URC1" was listed once on the 1200 Correction Notices.

Further, the government also claims that TSPs do not normally charge for loading services when picking up goods from an NTS warehouse and thus Platinum is not entitled to compensation for loading services for these 45 shipments. We note, however, that according to Mr. Thomas, in a normal DPM movement, the Origin DPM Contractor charges for loading the goods onto the freight truck. Tr. at 550. By contrast, under the hybrid method, there is no Origin DPM Contractor to charge for loading services. If loading is neither covered by an Origin DPM Contractor nor by an NTS contract, then loading must necessarily be performed by the TSP as an additional charge. Thus, we find that Platinum is entitled to the value of origin loading for 45 shipments and destination unloading for 43 shipments.

C.  Handling Freight at Positions Not Immediately Adjacent to Vehicle

The MFTURP allows a TSP to bill for "mov[ing] freight on shipments from or to a position that is not immediately adjacent to the vehicle." MFTURP-1, Item 49; JX 63 at App. 100. A TSP cannot charge for this accessorial service if the vehicle is merely "separated by an intervening sidewalk or walkway" from the unloading position. MFTURP-1, Item 49; JX 63 at App. 100.

Plaintiff argues that, by requesting that Platinum deliver the goods to each servicemember's residence, Platinum was expected to deliver the goods

33

into each servicemember's home. Indeed, the government does not contend that plaintiff failed to deliver the goods into servicemembers' homes or that it left the goods in driveways, on curbs, or on doorsteps. According to plaintiff, the interior of a home is "not immediately adjacent" to the truck, as it is separated by more than an intervening sidewalk and/or walkway. As a result, Platinum claims it should be compensated additionally for handling non-adjacent freight for 43 shipments.

The government disputes all of Platinum's charges associated with handling freight non-adjacent to the vehicle. It argues that JPPSO-MA never requested this service. There were no annotations on the GBLs or 1200 Correction Notices for handling non-adjacent freight, and there is no evidence this specific accessorial service was requested in any communications between JPPSO-MA and Platinum. In addition, the government questions whether the interior of servicemembers' residences are indeed separated by more than an "intervening sidewalk or walkway" from the delivery trucks.

The mere fact that neither the GBLs nor 1200 Correction Notices show the annotation, "HHB," for handling freight non-adjacent to the vehicle is not dispositive as to whether JPPSO-MA implicitly asked for this accessorial service. As plaintiff notes, contrary to expedited service, where the MFTURP states that "EXP is required to be annotated on [the GBL]" and that the "TSP must ensure [the GBL] is annotated with EXP . . . for charges to apply," MFTURP-1, Item 35; JX 63 at App. 96, the MFTURP places no such requirement for charging for handling freight not adjacent to the vehicle, *see generally* MFTURP-1, Item 49; JX 63 at App. 100.

Furthermore, there is testimony from Mr. Thomas that JPPSO-MA expected Platinum to deliver each servicemember's goods into their residence:

> THE COURT: What do you understand is going to happen when they get to Major Graham's house?
>
> THE WITNESS: That they were going to deliver [the goods] to the customer.
>
> THE COURT: And leave it in the road or the sidewalk or his front yard?

THE WITNESS: No, to the residence, because that's what they actually did.

THE COURT: Yeah, take it into his house, unpack everything—

THE WITNESS: Deliver it to—yes, sir, deliver it to—

THE COURT: —take the shrink wrap off.

THE WITNESS: —take the boxes and material things, um-hum.

Tr. at 535. We are persuaded that JPPSO-MA expected Platinum to deliver each servicemember's goods into and throughout their residence.

We also agree with plaintiff that, for these 43 shipments, delivering the servicemembers' goods into their residences qualifies as handling freight "not immediately adjacent" to the delivery truck. Perhaps if Platinum had merely left the goods on each servicemember's front porch, driveway, or curb, the distance between the delivery position and the vehicle would be "immediately adjacent." But, at trial, Mr. Smoot testified that Platinum's process for delivering goods into the servicemembers' homes involved taking the goods "off the truck, into the house, plac[ing] it where the member wants it, upstairs, downstairs, in the attic, whatever they want—or even in the garage with some items." *Id.* at 628–29. Accordingly, when Platinum (or one of Platinum's third-party contractors) delivered into each servicemember's residence, its truck was not only separated from each delivery position "by an intervening sidewalk or walkway," but also by additional space within and throughout the home. As a result, we find that Platinum has established that it handled freight "not immediately adjacent to the vehicle" within the contemplation of the MFTURP. Platinum is accordingly entitled to quantum meruit for handling non-adjacent freight for 43 shipments.

III.    Quantum Meruit

As we mention above, per the government's concessions, we find that the parties contracted for Platinum's line-haul freight services for all 45 shipments; as a result, Platinum is entitled to contract damages amounting to $317,627.90. JX 87. On the other hand, because we do not find a meeting of the minds between the parties on Platinum's rates for its accessorial services

for any of the shipments at issue, we now address the extent Platinum can recover in quantum meruit for those additional services.

## A. The Quantum Meruit Standard

"A recovery in quantum meruit is based on an implied-in-law contract. That is, a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). Although generally this court lacks jurisdiction over implied-in-law contracts, there is a limited exception where "a benefit has been conferred by the contractor on the government in the form of goods or services, which is accepted," and those goods or services are "received by the government prior to the rescission of the contract for invalidity." *Amdahl*, 786 F.2d at 393; *see also United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329–30 (Fed. Cir. 2006). In those cases, "the contractor 'may recover at least on a . . . quantum meruit basis for the value of the conforming goods or services.'" *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1374 (Fed. Cir. 2018) (quoting *Amadahl*, 786 F.2d at 393)); *see also Perri v. United States*, 340 F.3d 1337, 1344 (Fed. Cir. 2003) ("[C]ourts utilize[] quantum meruit as a basis for awarding the plaintiff the fair value of what it supplied to the government.").

Since Platinum's accessorial services—expedited service, loading and unloading, and handling freight non-adjacent to the vehicle—were rendered to and accepted by the government, it is only appropriate for Platinum to recoup the fair market value of those services. *Dureiko v. United States*, 62 Fed. Cl. 340, 358 (2004) (finding where services were rendered pursuant to an invalid express contract, "it would be unfair to permit the government to retain the benefits of the bargain it had made with the plaintiff without paying for them," and that quantum meruit is used "as a basis for awarding the plaintiff the fair value of what is supplied to the government."), *aff'd*, 162 F. App'x 976 (Fed. Cir. 2006). As a result, Platinum is entitled to be reimbursed on a quantum meruit basis for the accessorial services it performed. *Seh Ahn Lee*, 895 F.3d at 1374.

## B. Mr. Gmyr's Expert Report and Plaintiff's Motion in Limine

The government's expert witness on damages, Mr. Gmyr, prepared a report purporting to calculate the value of accessorial services rendered to

the government. *See generally* DX 245. Plaintiff has filed a motion in limine to exclude Mr. Gmyr's testimony and report from evidence.

Mr. Gmyr's report relies on the "stepped approach" to calculate Platinum's quantum meruit damages, which is a recommended approach in the litigation cost-accounting industry. *Id.* at 12. That approach (1) determines the type of claim at issue; (2) determines potential financial impacts; (3) determines the approach to quantifying damages based on the facts at issue; (4) reviews, in detail, the relevant documentation; (5) quantifies the financial impacts based on the relevant documentation; and (6) quantifies damages and/or applies adjustments to damages. *Id.* at 13.

Using the stepped approach, Mr. Gmyr determined that (1) Platinum's claim is for unpaid freight transportation charges, including charges for accessorial services, for which Platinum submitted bills for payment; and (2) the potential financial impact is lost revenues for the unpaid bills. *Id.* Mr. Gmyr then (3) determined that the approach for quantifying damages would involve (a) assessing what other TSPs would have charged the government for the same services and (b) inquiring which services Platinum properly performed in accordance with applicable freight rules and regulations. *Id.* at 13, 27. To pursue this approach, Mr. Gmyr (4) reviewed the relevant documentation pertinent to this case, including the GBLs and 1200 Correction Notices, reviewed deposition testimony, reviewed historical price data from other TSPs in the GFM system, and held conversations with defendant's counsel and government personnel from USTRANSCOM, MSDDC, GSA, and JPPSO-MA about the interpretation and application of rules and regulations governing the shipments at issue. *Id.* at 13–14, 27–28.

In (5) quantifying the financial impact of Platinum's unpaid bills, Mr. Gmyr calculated the average market rate per service for the shipments at issue by drawing from historical data in the GFM system. More specifically, Mr. Gmyr gathered freight tender data between 2016 and 2018 from all registered TSPs that offered the services charged by Platinum and applied those rates to the shipments at issue. DX 245 at 27–29. Based on those rates, Mr. Gmyr calculated an average market price for each accessorial service per shipment. *Id.* at 29, Attach. 7-b. Mr. Gmyr excluded Platinum's accessorial rates and the loading and unloading accessorial rates from one other TSP, Meadow Lark Transportation, Inc. ("Meadow Lark"), from his calculation, as Mr. Gmyr deemed their rates to be outliers. Tr. at 1044; DX 245 at 30–31.

After determining the average market rate per service for the shipments at issue, Mr. Gmyr then (6) applied deductions to the damages amount based on his application of the government's contract formation and performance arguments provided to him by defendant's counsel and agency personnel.[19] Tr. at 942, 1041, 1048. Those arguments were: (a) contracts could not be formed where JPPSO-MA issued a GBL or 1200 Correction Notice after Platinum began performance and where those documents did not reference Platinum's correct tender number; (b) expedited service could not be charged when it was not requested in accordance with the MFTURP; (c) loading services were already covered under Platinum's NTS contracts with JPPSO-MA; (d) handling non-adjacent freight could not be charged where it was not annotated on the GBL or 1200 Correction Notice; and (e) the delivery positions for most of the shipments Platinum performed were "immediately adjacent" to the delivery vehicle. DX 245 at 15–25.

Based on Mr. Gmyr's market calculations and subsequent deductions based on the government's arguments, Mr. Gmyr ultimately concluded that Platinum's quantum meruit damages amounted to $400,612, including $176,889 for line-haul for all 45 shipments, $3,990 for origin loading for only two shipments,[20] and $219,733 for destination unloading for 43 shipments. *Id.* at 33.

Plaintiff's motion in limine argues that Mr. Gmyr is not qualified to calculate the value of Platinum's accessorial services, because although Mr. Gmyr has experience in financial analysis and forensic accounting, he has no specialized experience in the transportation industry, let alone in the movement of household goods under the DPM. Plaintiff also argues that Mr. Gmyr's expert report is irrelevant to the calculation of damages, because it does not include TSP availability during the relevant peak seasons and

---

[19] Although Mr. Gmyr describes the bases for his deductions as "regulatory assumptions," we decline to adopt this label. The "assumptions" Mr. Gmyr adopts are not based exclusively on regulations but are, more accurately, Mr. Gmyr's application of the government's contract formation and performance legal arguments.

[20] Mr. Gmyr's damages total for origin loading encompassed only two shipments, Tratchell and McNally, as Mr. Gmyr believed those shipments were not handled under NTS contracts with Platinum. DX 245 at Attach. 5.

unreasonably excludes Platinum's and Meadow Lark's accessorial rates from the damages calculation. Additionally, plaintiff alleges the report lacks a reliable methodology, because it fails to reference any recognized expert applying the same method for calculating damages. It describes Mr. Gmyr's methodology as "nothing more than a work plan by which he assembles and reviews data." Pl.'s Mot. at 13. Plaintiff also argues that Mr. Gmyr's deductions methodology merely involves adopting defendant counsel's arguments about whether Platinum should be compensated for the work it performed, and that Mr. Gmyr lacks any independent legal expertise in this matter. Thus, according to plaintiff, Mr. Gmyr's expert testimony should be excluded.

In response, the government argues that Mr. Gmyr needs no expertise in the transportation industry to value the accessorial services rendered to the government, because the task only requires expertise in cost-accounting. The government also claims Mr. Gmyr's valuation methodology is reliable as Mr. Gmyr based his calculations on the "stepped approach," which is commonly used in the litigation cost-accounting industry. Furthermore, defendant asserts that an expert's assessment of damages is not any less relevant or reliable just because it involves simple mathematical calculations. Defendant also argues that, although Mr. Gmyr is not allowed to provide his own legal interpretations, he should be able to apply arguments given to him by counsel. According to defendant, plaintiff merely disagrees with the manner in which Mr. Gmyr prepared his expert report, and plaintiff's objections pertain to the weight of the evidence—not admissibility.

Generally, the proponent of disputed evidence "bears the burden of proving the evidence's admissibility by a preponderance of the evidence." *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 492 (2022). Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)–(d).

Rule 702 "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). Thus, "a trial judge must determine 'at the outset' whether an expert is qualified." *Gilead Scis., Inc. v. United States*, 160 Fed. Cl. 330, 336 (2022) (quoting *Daubert*, 509 U.S. at 592). We note, however, that "[w]hile the court may require that an expert witness be 'a member of a particular profession,' in order for [them] to be qualified, generally it is not necessary for an individual to be 'a specialist in a particular branch of a discipline or profession.'" *Zoltek Corp. v. United States*, 95 Fed. Cl. 681, 684 (2010) (internal citation omitted). Indeed, we have held that, where a damages expert has ample expertise in cost-accounting, especially in previous litigation matters, yet lacks specific expertise in the subject matter at hand, that expert is nonetheless qualified to provide a reliable opinion on damages. *Gilead Scis.*, 160 Fed. Cl. at 339. The damages expert's lack of industry-specific expertise instead pertains to the *weight* we give their opinion—not admissibility. *Id.*

We are also required under Rule 702 to ensure that expert testimony is both relevant and reliable. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003) ("The trial court acts as a 'gatekeeper' to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case."). Relevance turns on "whether the expert testimony will 'help the trier of fact to understand the evidence or to determine a fact in issue,'" and reliability turns on "whether the testimony is grounded in methods and procedures that are accepted in the expert's discipline." *Conn. Yankee Atomic Power Co. v. United States*, 169 Fed. Cl. 450, 452 (2024) (quoting *Daubert*, 509 U.S. at 591). Our assessment of these factors is "a flexible one" and may "depend[] on the nature of the

40

issue, the expert's particular expertise, and the subject of his testimony."
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

Here, we find that Mr. Gmyr is qualified to testify on the fair market value of accessorial services performed by Platinum. Mr. Gmyr does not purport to rely on any experience in the transportation industry (he has none) in arriving at his damages numbers. Nor do we see any reason why he would need transportation-specific experience to calculate quantum meruit damages in this case. The question is whether the basic assumption on which he operates—that the relevant source for valuing transportation services is what other comparable transportation providers charge—is solid. We think it is. The GFM system contains tenders from other TSPs, which include their rates for the same accessorial services offered by Platinum. Tr. at 74–75, 111, 751, 764–65, 786–92, 817–19, 824–25. As TSP price data is already available in the GFM system, we agree with Mr. Gmyr that an appropriate method for determining the fair market value of accessorial services performed by Platinum is to gather price data from other TSP tenders in the GFM system and calculate an average rate per service. This does not require transportation expertise, but rather expertise in cost-accounting—and Mr. Gmyr has plenty. Mr. Gmyr attained a Bachelor of Science in Finance in 1999 and has gained more than 25 years of experience in damages analysis in various government contracts disputes involving numerous industries. *Id.* at 928–32; DX 245 at 2, Attach. A, Attach. B. As in this case, we believe his cost-accounting expertise is sufficient for calculating the fair market value of accessorial services performed by Platinum.

We also find Mr. Gmyr's valuation testimony relevant. Mr. Gmyr's report analyzes rate data from other TSPs registered in the relevant government system—GFM—during the relevant time periods—2016 through 2018—and for the relevant accessorial services at issue—expedited service, loading and unloading, and handling non-adjacent freight. DX 245 at 27–29, Attach. 7-b. These data parameters give the court a picture of what the average TSP, in a similar position as Platinum, would have charged JPPSO-MA for the pertinent accessorial services. Although, as plaintiff points out, Mr. Gmyr's report does not draw data exclusively from the peak summer months, plaintiff offers no evidence suggesting that TSPs routinely amend their tenders during peak seasons to raise their accessorial rates.

Nor do we fault Mr. Gmyr's exclusion of Platinum's accessorial rates and Meadow Lark's loading and unloading rates. Mr. Smoot himself admitted that Platinum's listed accessorial rates were exorbitant and that he would have charged the government a much lower rate if he were aware of this issue beforehand. Tr. at 653, 741–42. By comparison, Meadow Lark's loading and unloading rates were between 100% and 400% *higher* than Platinum's rates and dwarfed every other TSP's rates for the same services. DX 245 at 30–32, Attach. 7-c. Thus, we do not find it unreasonable that Mr. Gmyr excluded these data points as statistical outliers.

Additionally, we find Mr. Gmyr's valuation testimony reliable. Contrary to plaintiff's assertions, the stepped approach is simply a commonsense approach to a mathematical inquiry frequently used in the damages accounting industry. *Id.* at 12–13. As Mr. Gmyr cites, there are peer reviewed publications that feature this approach for financial experts. *Id.* at 12 n.55 (citing ROMAN L. WEIL ET AL., LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT (6th ed. 2017)). Although plaintiff describes this approach as merely a "work plan by which [Mr. Gmyr] assembles and reviews data," we do not find Mr. Gmyr's methodology unreliable simply because it is straightforward. Hence, we find Mr. Gmyr's methodology useful. Because we find Mr. Gmyr's valuation testimony relevant and reliable, we deny plaintiff's motion in limine regarding Mr. Gmyr, and we admit Mr. Gmyr's testimony,[21] as well as his expert report, DX 245.[22]

We accord, however, no weight to Mr. Gmyr's damages deductions based on his application of the government's contract formation and performance arguments. Mr. Gmyr is in no position to instruct the court on

---

[21] Plaintiff's motion in limine to exclude defendant's fact witnesses, Mr. Walker, Mr. Jones, and Mr. Fisher, is denied as moot, as the witnesses were not allowed to testify regarding the interpretation and application of applicable regulations, nor about matters outside their personal knowledge. *See* Tr. at 805–06, 836–39.

[22] As plaintiff's objection to DX 97 is predicated on its objection to Mr. Gmyr's expert report, we admit DX 97 as a summary of data rendered to Mr. Gmyr. Accordingly, DX 2 is admitted as demonstrative evidence for the same reason.

issues of law. *See Sparton Corp. v. United States*, 77 Fed. Cl. 1, 7 (2007) ("In general, federal courts have found expert testimony on issues of law, either giving a legal conclusion or discussing the legal implications of evidence, to be inadmissible."); *Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) ("An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all."). Thus, we only accord weight to his valuation testimony without deductions.

C.  Damages Calculation

We rely on Mr. Gmyr's valuation calculations in determining Platinum's quantum meruit damages.[23] As we note above, Platinum is entitled to be reimbursed for the value of expedited service for three shipments, origin loading for 45 shipments, destination unloading for 43 shipments, and handling non-adjacent freight for 43 shipments. After incorporating Mr. Gmyr's calculations, in which he averaged the rates for each accessorial service across GFM-registered TSPs (excluding outliers) and applied those average rates to the shipments at issue here, we arrive at the following value determinations: $1,591 for expedited service for three shipments,[24] $247,285 for origin loading for 45 shipments,[25] $219,736 for

---

[23] Since we apply Mr. Gmyr's valuation in our damages assessment, we decline to apply GSA's valuation based on the 400 NG program, especially since Platinum was not a participant in that program. Tr. at 611, 682, 740–41, 886, 911. We also decline to extrapolate from Mr. Smoot's statement that he would have charged "200 percent of the tariff," as he subsequently states that there are "too many variables" involved for that rate to be certain. *Id.* at 742–43.

[24] Mr. Gmyr's expedited service calculations for the three applicable shipments are $883 (Silvera), $92 (Buck), and $616 (Wilkerson), totaling $1,591. DX 245 at Attach. 7-b.

[25] Mr. Gmyr's origin loading calculations for the 45 shipments are $2,844 (Graham), $406 (Liftman), $4,919 (Darling), $2,678 (Harrison), $4,398 (Mitchell), $3,183 (Schulte), $5,593 (Williams), $1,968 (Hurley), $1,713 (Bean), $3,510 (Bryant), $4,717 (Amerine), $478 (Anderson), $2,774 (Tratchel), $1,216 (McNally), $2,517 (Silvera), $4,312 (Langford), $5,361 (Buck), $7,184 (Diehl), $4,827 (Mackey), $1,865 (Ringer), $5,508 (Mozingo), $10,613 (Perez), $3,394 (Eaton), $8,783 (Fernandez), $2,032

destination unloading for 43 shipments,[26] and $15,185 for handling non-adjacent freight for 43 shipments.[27] DX 245 at Attach. 7-b. Altogether,

_____

(Turner), $1,163 (Poole), $11,683 (Toleafoa), $5,384 (Radford), $11,191 (Blakenbaker), $8,309 (Brown), $5,576 (Green), $10,259 (Huewitt), $4,655 (Moore), $1,730 (Parsons), $4,589 (Adams), $2,197 (Brown), $9,497 (Browne), $5,275 (Carrionrodriguez), $7,954 (Bouchat), $6,115 (Wilkerson), $8,131 (Vigil), $9,600 (Weibel), $9,635 (Chubb), $15,754 (Johnson), and $11,795 (Silverman). *Id.* Although Mr. Gmyr's report totals these charges at $247,282, the actual total is $247,285 ($3 more). *Id.*

[26] Mr. Gmyr's destination unloading calculations for the 43 shipments are $2,844 (Graham), $406 (Liftman), $4,919 (Darling), $2,678 (Harrison), $4,398 (Mitchell), $3,183 (Schulte), $5,593 (Williams), $1,968 (Hurley), $1,713 (Bean), $3,510 (Bryant), $4,717 (Amerine), $478 (Anderson), $2,774 (Tratchel), $1,216 (McNally), $2,517 (Silvera), $4,312 (Langford), $5,361 (Buck), $7,184 (Diehl), $4,827 (Mackey), $1,865 (Ringer), $5,508 (Mozingo), $10,613 (Perez), $3,394 (Eaton), $8,783 (Fernandez), $2,032 (Turner), $1,163 (Poole), $11,683 (Toleafoa), $5,384 (Radford), $11,191 (Blakenbaker), $8,309 (Brown), $5,576 (Green), $10,259 (Huewitt), $4,655 (Moore), $1,730 (Parsons), $4,589 (Adams), $2,197 (Brown), $9,497 (Browne), $5,275 (Carrionrodriguez), $7,954 (Bouchat), $6,115 (Wilkerson), $8,131 (Vigil), $9,600 (Weibel), and $9,635 (Chubb). *Id.* Although Mr. Gmyr's report totals these charges at $219,733, the actual total is $219,736 ($3 more). *Id.*

[27] Mr. Gmyr's handling non-adjacent freight calculations for the 43 shipments are $338 (Graham), $252 (Liftman), $470 (Darling), $382 (Harrison), $446 (Mitchell), $398 (Schulte), $504 (Williams), $344 (Hurley), $326 (Bean), $408 (Bryant), $469 (Amerine), $262 (Anderson), $380 (Tratchel), $298 (McNally), $376 (Silvera), $447 (Langford), $473 (Buck), $375 (Diehl), $344 (Mackey), $223 (Ringer), $354 (Mozingo), $390 (Perez), $282 (Eaton), $375 (Fernandez), $230 (Turner), $180 (Poole), $356 (Toleafoa), $354 (Radford), $395 (Blakenbaker), $375 (Brown), $358 (Green), $386 (Huewitt), $331 (Moore), $218 (Parsons), $328 (Adams), $236 (Brown), $356 (Browne), $285 (Carrionrodriguez), $375 (Bouchat), $371 (Wilkerson), $375 (Vigil), $380 (Weibel), and $380 (Chubb), totaling $15,185. *Id.* Mr. Gmyr's calculations for Johnson ($324) and Silverman ($301) were excluded from the total, as those were the two 2018 shipments where Platinum did not handle non-adjacent freight at the servicemember's

44

including $317,627.90 for Platinum's line-haul services for all 45 shipments, Platinum is entitled to a total of $801,424.90 in damages.

CONCLUSION

As we explained above, plaintiff has established its breach of contract claim regarding its line-haul freight services. As a result, plaintiff is entitled to contract damages for those services. We also conclude that plaintiff has not established its breach of express contracts for its accessorial services, as there was no meeting of the minds on plaintiff's rates for those services. Nevertheless, because plaintiff rendered its accessorial services to the government, and because those services were accepted by the government, plaintiff is entitled to quantum meruit damages for the accessorial services rendered. Accordingly, the following is ordered:

1.  The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendant in the amount of $801,424.90.

2.  No costs.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge

---

residence but instead delivered to a Destination DPM Contractor's warehouse.